FILED
JAN 1 3 2020
Clerk, U S District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> NICHOLAS JOHN MONTANO, <br><br> Defendant. | CR 18-123-BLG-SPW-1 <br><br> ORDER DENYING MOTION TO SUPPRESS |

Nicholas John Montano has filed a Motion to Suppress Evidence and In Limine. (Doc. 54.) Montano argues that the Court should suppress evidence discovered as a result of an inventory search of his backpack. (Doc. 55 at 5–7.) He also argues that the Court should rule inadmissible evidence of 3.45 grams of methamphetamine discovered while Montano was fleeing from law enforcement. (*Id.* at 8–10.) On December 13, 2019, the Court held a hearing on the motion. (Doc. 69.) For the following reasons, the motion is denied.

I.  **Background**

On August 15, 2018, Billings Police Department Officers Ben Milam and Steven Gaertner responded to a 911 call at the Cracker Barrell restaurant in Billings, Montana. (Doc. 60 at 2.) The caller stated individuals he did not know were blocking his daughter's vehicle in a parking space in the parking lot. (Doc. 60-2 at

1

3.) Upon arrival, the officers met Trystan White and Kayla Clause. White and Clause informed the officers that an SUV had previously blocked their vehicle in a parking space but had since fled. (Doc. 60-2 at 3.) The SUV's driver was an individual named Nick whom they had travelled to Missoula with earlier that day.

Nick had left his bag in their vehicle and blocked them in to demand the bag's return. White could not return the bag because she had locked her keys in her car. Her keys remained locked in her car when the officers arrived.

White and Clause did not know Nick well. They could tell the officers his approximate age, but they could not accurately say what his last name was. White told Officer Milam that Nick's last name was "Montoya." (Doc. 60-1.)

White did not know what the contents of Nick's bag were, either. Nevertheless, she wanted it removed for fear that Nick would retaliate and damage her vehicle to retrieve it later. White did, however, state it was possible drugs were in the bag and believed "the Cartel" would come after her for the bag's contents. (Doc. 60-2.)

The officers assisted White in unlocking her vehicle, and White gave them consent to search her vehicle for the bag. (Doc. 60-2.) The officers removed the bag and several other items White said belonged to Nick, including a black pistol holster. (*Id.*) The officers left the scene and proceeded to the Billings Police Department evidence facility. (*Id.*)

2

Nothing on the bag indicated ownership, and the officers only knew Nick's first name. Officer Milam believed Nick's last name was "Montoya" based on his conversation with White and Clause. Officer Gaertner later ran Nick's name through dispatch along with some of the details about Nick the women gave him, including Nick's general age, his first name, a last name similar to "Montoya," and the fact that Nick had recently been released from prison. Dispatch returned the name "Nick Montano." However, neither Officer Milam nor Officer Gaertner attempted to find contact information for Nick at that time.

At the evidence facility, the officers conducted an inventory search of the backpack. (Doc. 60-2.) They found a wallet with cash inside it, a baggie they believed could contain an illegal substance, and a pistol magazine. (*Id.*) The officers stopped inventorying each item once they found the baggie but otherwise ensured nothing dangerous was in the backpack. (*Id.*) A search warrant was later obtained for the backpack, and testing showed the substance in the baggie to be methamphetamine.

Around the early morning hours of August 19, 2018, law enforcement discovered Montano driving a stolen vehicle, and he eluded arrest. (Doc. 60-5 at 3.) Montano crashed the vehicle and fled the scene on foot. (*Id.* at 4.) Officer William Cook received information that Montano may have fled to an apartment complex on North 26th Street. He responded to the location and began clearing apartment units

3

with other officers and looking for Montano. He found a clear baggie with a white crystalline substance laying on the stairs below the complex's top level. The bag was later confirmed to contain 3.45 grams of methamphetamine. The complex had six units, (*Id.* at 7.), and somewhere around three stories (Officer Cook could not recall exactly how many there were while later testifying). Ultimately, officers found and arrested Montano in an apartment on the lowest level. He had over $1,600 in cash on his person. (*Id.* at 8.)

## II. Discussion

### 1. Inventory Search of Montano's Backpack

Generally, the Fourth Amendment requires police to obtain a warrant before searching "houses, papers, and effects." U.S. Const. amend. IV. This includes containers like backpacks. *United States v. Ross*, 456 U.S. 798, 823 (1982); *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978) ("[M]ankind's valises, suitcases, footlockers, strong boxes, etc. are frequently the objects of his highest privacy expectations . . . ."). However, inventory searches are a "well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). When police are responsible for property taken into their custody, they may secure the property through an inventory search by following standardized procedures. *Id.* at 372–73. Inventory searches allow police to protect property from unauthorized interference, avert any danger the property may pose to police or

4

others, and guard against claims of theft, vandalism, or negligence. *Id.* at 373. "To be valid, an inventory search must conform to a standardized and established local procedure, and must be motivated by a 'concern to inventory [the items] rather than to search for other incriminating evidence.'" *United States v. Bowhay*, 992 F.2d 229, 230 (9th Cir. 1993) (quoting *United States v. Feldman*, 788 F.2d 544, 550 (9th Cir.1986)) (alterations in original).

The Billings Police Department has a policy establishing guidelines for handling found property ("BPD Found Property Policy"). (Doc. 60-3.) The policy's goal is to ensure property is returned to its rightful owner while protecting officers and evidence personnel from dangers the property may pose. (*Id.* at 1.) When handling a found personal backpack, officers must secure the backpack, inventory its contents, and separately secure items that pose a danger, such as firearms. (*Id.* at 2.) During an inventory search, if the officers know the identity of a possible owner and locate illegal contents (like drugs), the officers must stop inventorying individual items, ensure there is nothing else dangerous in the bag, and apply for a search warrant. (*Id.*)

In his reply brief, Montano contends police searched his backpack twice. (Doc. 68 at 2.) He states officers first searched his backpack in the Cracker Barrel parking lot and searched his backpack again after taking it to the evidence facility. (*Id.* at 3.) Montano points to a statement in Officer Milam's police report to support

this view: "Ofc Gaertner began an inventory search while I was still on scene." (Doc. 60-1 at 3.) He interprets that statement as indicating Officer Gaertner began the inventory search while both officers were at the Cracker Barrel. During the suppression hearing and on cross-examination, Montano asked Officer Milam about the statement. Officer Milam testified that the phrase "on scene" referred to the evidence facility in that context. Officer Gaertner, however, later testified on cross-examination that he had never heard of another officer using the phrase "on scene" to refer to the evidence facility.

The Court finds the officers did not search the backpack while they were at the Cracker Barrel. Both officers testified they searched the backpack only once—at the evidence facility. Both officers denied opening or searching the backpack in the Cracker Barrel parking lot.

Montano also argues the officers violated the BPD Found Property Policy by failing to contact Montano and notify him that they had his backpack. The policy requires an officer who is able to determine ownership of found property to "attempt to contact the owner and interview the owner about the circumstances of the item in question." (Doc. 60-3 at 1.) However, both officers testified the policy does not require them to attempt to contact an owner before placing the property into evidence. Nothing in the policy's language indicates as much. *See* (*Id.*). Even so, both officers were unsure whether Montano was the backpack's owner. The officers

did not violate the BPD Found Property Policy by failing to contact Montano before conducting an inventory search of his backpack while placing it at the evidence facility.

In fact, based on the officers' testimony and their supplemental reports, the officers followed the BPD Found Property Policy by the book. They secured the backpack and its contents in the Cracker Barrel parking lot; they did not search the backpack in the parking lot but instead took it to the evidence facility; they began inventorying the backpack's contents for the safety of other officers and evidence personnel; and after finding a baggie with a white substance they believed to be an illegal drug, they ceased inventorying the backpack's contents pending a search warrant. Accordingly, the inventory search was valid.

*2. Methamphetamine Found at the Apartment Complex*

Montano also makes a motion in limine to exclude any reference to the 3.45 grams of methamphetamine officers found in the apartment complex he was hiding in. He argues the evidence is both irrelevant under Fed. R. Evid. 401 and excludable under Fed. R. Evid. 403 because Officer Cook located the methamphetamine on a different floor in the apartment complex than the floor officers apprehended Montano on.

Officer Cook testified that based on his training and experience, he believed the baggie was Montano's because suspects with illegal contraband often attempt to

discard it when they are fleeing. The apartment complex had six units dispersed across approximately three stories. In an interview with officers after his arrest, Montano explained, "Yeah, I remember, like I was knocking on all the doors, trying to get someone to answer." (Doc. 68-1 at 4.)

Based on these facts, the evidence is relevant and admissible under Fed. R. Evid. 401 and 403. Although Montano was arrested on the bottom floor, the complex was small, Montano was fleeing from officers, Officer Cook testified suspects often discard contraband while fleeing, and Montano stated he was "knocking on all the doors" of the 6-unit complex—implying he travelled to each floor. The 3.45 grams of methamphetamine Officer Cook located on the top staircase is relevant, and its probative value is not substantially outweighed by any of the dangers listed in Fed. R. Evid. 403. Accordingly, the evidence is admissible.

**IT IS HEARBY ORDERED** Montano's Motion to Suppress Evidence and In Limine (Doc. 54) is **DENIED**.

The clerk of court is directed to notify counsel of the entry of this Order.

DATED this 13th day of January, 2020.

SUSAN P. WATTERS
United States District Judge