IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>NICHOLAS JOHN MONTANO,<br><br>Defendant. | CR 18-123-BLG-SPW<br><br>OPINION AND ORDER |

After a jury trial, Defendant Nicholas Montano ("Montano") was convicted on two counts: possession of a controlled substance with intent to distribute and conspiracy to possess a controlled substance with the intent to distribute. Montano now moves for a new trial based on newly discovered evidence. The Court finds this motion capable of resolution without a hearing. After reviewing the newly discovered evidence, the briefing, and the trial transcript, the Court denies this motion.

I.  **Background**

   **A. Montano's Arrest**

   On August 15, 2018, police seized a black backpack from a car after an incident at a Billings restaurant. (Tr. 136:9-11). During the routine inventory

1

process, officers found a cash-stuffed wallet and crystals they believed to be methamphetamine. (*Id.* at 120:4-14). After receiving a warrant to fully search the bag, officers found 32.6 grams of methamphetamine divided between two bags, over $3,000 in cash, a syringe, and Montano's Access to Health and Social Security cards. (*Id.* at 130:6-18).

Four days later, officers attempted to arrest Montano at a gas station in Billings. (*Id.* at 155:18-25). Montano fled, first in a stolen vehicle, and then, after crashing the car, on foot. (*Id.* at 155:15-156:24). Tracking him to an apartment complex, the police found and arrested Montano inside the building. (*Id.* at 157:25). Montano had $1,645 in cash on his person and officers recovered a bag with 92.5 grams of methamphetamine from a hallway in the apartment building Montano had run down. (*Id.* at 208:14-209:22). Baggies in the abandoned bag matched ones found in the stolen vehicle. (*Id.* at 235:5).

### B. Conviction

At trial, the prosecution put on testimony from law enforcement officers and three witnesses who were personally involved with Montano: Trystan White ("White"), Joshua Clause ("Joshua"), and Kayla Clause ("Kayla"). Law enforcement witnesses outlined the events leading to Montano's eventual arrest, including the seizure of the backpack from the car with Montano's identifying information inside and the chase four days later. Montano's cell phone, recovered

during his arrest and examined by officers, contained a series of text messages to an unknown number apparently setting up a drug sale for three ounces of product. (*Id.* at 242:15-245:7).

White testified that she and Montano knew each other because Montano and her brother, Joshua Clause, were importing and selling methamphetamine together. (*Id.* at 38:10-18). After Joshua Clause was arrested for methamphetamine possession and distribution, White, Montano, and Kayla Clause (Joshua's wife) drove to Missoula to secure representation for Joshua. On that trip, according to White, Montano brought a black bag, and left it in her car after the trip. (*Id.* at 42:21-43:22). White examined the bag before surrendering it to police and found drug paraphernalia, cash, and methamphetamine inside. (*Id.* at 50:6-8). White further testified that she saw Montano participate in many drug-related activities, including using methamphetamine and packaging the drugs for further distribution. (*Id.* at 41:3-42:4). White admitted that she never actually observed either her brother or Montano physically distributing the drugs to anyone, however. (*Id.* at 41:9-10).

Joshua Clause testified extensively to his and Montano's involvement in the drug trade together. Joshua habitually used methamphetamine and in 2018 began selling the drug. (Tr. 256:24). By the time of his arrest in August 2018, he estimated he imported over 400 pounds of methamphetamine to Billings. (*Id.* at

257:4).  Joshua self-identified as a wholesaler of the product; he distributed multi-pound quantities to his subordinates, who then sold even smaller amounts to street level dealers. (*Id.* at 263:2-25). He named Montano as one such associate, who received drugs from Joshua and would then break down and repackage pounds of methamphetamine into smaller quantities, such as ounces. (*Id.*) Clause testified that he supplied Montano with 10 to 15 pounds of methamphetamine over four months. (*Id.* at 266:10-14).

Joshua faced a minimum 35-year sentence for his crimes that was reduced to 15 years due to his cooperation and testimony. (*Id.* at 257:5-24). On cross-examination, the Defense questioned both Joshua and White about negative feelings toward Montano, including anger toward him for allegedly breaking into White's car and allegedly sleeping with Joshua's wife.

### C. Newly Discovered Evidence

While incarcerated, Montano apparently met a fellow inmate, Samuel Yarbro.  Yarbro dated White, who testified at Montano's trial.  Yarbro summarized his evidence in a letter.  According to Yarbro, during their relationship, White periodically became inebriated and upset, crying about how she and her brother (Joshua) "falsely testified" during Montano's trial, apparently due to personal animus toward the defendant. (Pl. Ex. 1 at 1). Yarbro, concerned about this confession, sat White down sober and asked about the truth of her claim.

4

According to Yarbro, White began crying again and admitted she and her brother lied about giving Montano drugs and seeing him deal drugs. (*Id.* at 2). White, when interviewed by law enforcement after Defendant brought this evidence to light, denied the claims but confirmed that she dated Yarbro during approximately that timeframe. (Def. Ex. 1).

## II.    Discussion

Upon the defendant's motion, a district court may vacate the judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). The interests of justice include newly discovered evidence. *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). To prevail on a Rule 33 motion based on newly discovered evidence, a defendant must satisfy a five-part test: (1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal. *Harrington*, 410 F.3d at 601. Courts exactingly apply this test and generally disfavor this measure. 3 Fed. Prac. & Proc. Crim. § 584 (4th ed.).

The parties agree that Yarbro's information satisfies the first two prongs of the test but disagree as to final three elements. It was clearly discovered post-trial and its late discovery was not due to lack of diligence by the defendant.

To satisfy the materiality prong, evidence must be both relevant and admissible. 3 Fed. Prac. & Proc. Crim. § 584 (4th ed.); *see also U.S. v. Orzoff*, 466 F. Supp, 926 (C.D. Cal. 1979), aff'd, 603 F.2d 227 (9th Cir. 1979). Yarbro's letter and the information within it are both out-of-court statements presumably offered for the truth of the matter. Yarbro does not claim to have any independent knowledge of the case. His testimony would solely concern White's alleged statements to him. Therefore, the testimony is hearsay. The Defendant has not raised any hearsay exceptions that would allow this statement to be admitted for any purpose other than impeachment. As such, Yarbro's testimony would only be material to the extent that it could be used to impeach White's testimony or motives for testifying.

Newly discovered evidence that is merely impeachment material is insufficient to merit a new trial. *United States v. Kulczyk*, 931 F.2d 542, 549 (9th Cir. 1991). To go beyond mere impeachment evidence, and therefore to satisfy the fourth prong, the evidence must have a strong exculpatory connection to the charge against the defendant or totally undermine critical evidence. *United States v. Quiles*, 618 F.3d 383, 395 (3rd Cir. 2010). Here, the evidence goes to White's

6

credibility. Yarbro asserts that White told him that she and her brother intentionally lied to and misled investigators and the jury about Montano's involvement. White denies this allegation and asserts she would testify the same way at a new trial. This evidence is merely impeachment material because its only purpose is to discredit the witness by providing an alternative explanation for her testimony. It merely adds to the strategy already executed at trial and is not so strongly exculpatory as to totally undermine White's testimony.

Finally, even if the evidence was admissible and went beyond merely impeaching White, the evidence fails to indicate that a new trial would probably result in acquittal. It is far from certain the jury would wholly believe Yarbro. White's alleged statement to Yarbro lacks clarifying detail beyond a bare assertion that White lied. There is no other evidence corroborating the idea that the operation was a set-up. Copious physical and testimonial evidence from other witnesses connects Montano to the drugs. The letter does not mention the drugs in the backpack later identified as Montano's. It also doesn't relate to the chase that led to Montano's arrest. Montano was convicted on two counts; neither is so undermined that a new trial would likely result in his acquittal. The jury heard and considered many pieces of evidence as to Montano's mental state and his possession of methamphetamine. The jury, in making those findings would be unlikely to deliver a different verdict, when viewing the evidence presented in its

entirety, even if Yarbro's evidence was considered. As stated above, the proffered testimony merely supplements the theory advanced at trial, making it unlikely to alter the final verdict.

### III. Conclusion

For the forgoing reasons, the Defendant's Motion for a New Trial (Doc. 140) is DENIED and the matter shall be set for sentencing.

DATED this 8th day of October, 2020.

                                        SUSAN P. WATTERS
                                        United States District Judge