IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>NICHOLAS JOHN MONTANO,<br><br>Defendant/Movant. | CR 18–123–BLG–SPW<br><br><br>OPINION<br>and ORDER |

On October 18, 2018, a grand jury indicted Defendant/Movant Nicholas John Montano with conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846 and possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). (Doc. 1.) Following a jury trial in February 2020, Montano was convicted on both counts, (*see* Doc. 105), and, on May 6, 2021, sentenced to concurrent terms of 151 months of custody, (*see* Doc. 172). In June 2022, his conviction was affirmed on appeal. (Docs. 181, 183.) Montano now seeks federal habeas relief under 28 U.S.C. § 2255. (Docs. 184, 208.) For the reasons provided below, that motion is denied.

1

## BACKGROUND

### I.     Trial

A three-day jury trial was held in February 2020.  (*See* Docs. 135–37 (transcripts)[1], 105 (verdict).)  The government called 11 witnesses, including eight law enforcement officers.  (*See* Doc. 111 at 1–2.)  The defense called three witnesses, including two law enforcement officers.  (*See id.* at 3.)  The government's case and the defense's theory are outlined below.

### A.     The Case Against Montano

The government's case against Montano was based on his alleged involvement in a large methamphetamine trafficking organization operating in Billings, Montana in the spring/summer of 2018, and two specific incidents that occurred in August 2018.

As it relates to the drug trafficking organization, from April to August of 2018, an individual named Joshua Clause distributed large amounts of methamphetamine in the Billings area, ultimately importing over 400 pounds from California.  (Tr. 257, 260.)  Clause sold multi-pound quantities to certain individuals, referred to as his lieutenants, who would then distribute user amounts. (Tr. 263, 371.)  Beginning in June 2018, Montano was one of those lieutenants. (Tr. 263, 371).  Clause testified that from June 2018 to August 2018, Montano

---

[1] The trial transcript is cited as "(Tr. [page no.].)"

purchased methamphetamine from him weekly, buying a quarter pound to pound quantities at a time. (Tr. 266.) According to Clause, Montano purchased a total of 10 to 15 pounds of methamphetamine from him. (Tr. 266.) On August 10, 2018, Clause was arrested and taken into custody. (Tr. 274.) Ultimately, at least a dozen individuals were indicted as part of the "Clause conspiracy," including Montano and his codefendant, Tianna Marie Pantalion.[2]

According to the government, there were two incidents in August 2018 that drew law enforcement's attention to Montano. First, on August 15, Clause's sister (Trystan White) and his wife (Kayla Clause) traveled from Billings to Missoula, Montana to pay an attorney a retainer of $30,000 to represent Clause. (Tr. 36.) At Clause's suggestion, Montano accompanied them on this trip. (Tr. 36, 81.) During the trip, all three individuals used methamphetamine. (Tr. 44, 83.) White testified that she knew Montano because he had sold methamphetamine out of a hotel with her then-boyfriend and Clause's former drug associate, Joshua Roberts, in the spring of 2018. (Tr. 38–39, 59–61.) According to White, it was not until after Roberts got arrested on a probation violation in June 2018 that Montano and

---

[2] On December 18, 2018, Montano's codefendant pled guilty to a single count of possession with intent to distribute methamphetamine. (*See* Doc. 29.) On June 7, 2019, she was sentenced to 63 months of custody with four years of supervised release to follow. (*See* Docs. 39, 40.) She did not testify at Montano's trial.

Clause began to interact directly. (Tr. 40, 58, 61–62.) And while Kayle Clause had never met Montano before, she knew he was a "friend of [Clause]'s." (Tr. 81.)

On the return journey from Missoula, Kayla Clause dropped both White and Montano off in Laurel, Montana to meet with one of Clause's other associates. (Tr. 45–47.) White became paranoid that either law enforcement or "the cartel" was following them and that the associate's home was being raided, so she asked Kayla Clause to return to Laurel pick her up. (Tr. 45–47.) Kayla Clause did so. (Tr. 47.) Once Kayla Clause and White were back on the road to Billings without Montano, White noticed that Montano's bag was still in the backseat of the vehicle. (Tr. 47.) She became paranoid that he had left it on purpose to set her up. (Tr. 48, 87.) As a result, she and Kayla Clause pulled over at the Cracker Barrel outside Billings and called law enforcement to take the bag. (Tr. 48.) Law enforcement did so and, upon performing an inventory search, discovered two baggies of a white crystalline substance they believed to be methamphetamine, a wallet with cards identifying Montano, $3,075 in cash, two firearm magazines, and a syringe. (Tr. 48, 89, 117–122.) They later confirmed that the white substance was 32.6 grams of actual methamphetamine. (Tr. 226, 300.)

The second incident occurred a few days later, on August 19, when law enforcement saw Montano at a gas station in Billings driving a stolen Escalade. (Tr. 155, 173.) At that time, there was a federal warrant for Montano's arrest

4

related to an alleged probation violation. (Tr. 161.) He fled in the Escalade, crashing into another car and fleeing on foot. (Tr. 155–56, 166, 174–75, 196.) After an extensive foot search, law enforcement located Montano in the utility room of a nearby apartment building. (Tr. 196–207.) During that search, law enforcement also located a baggie on the stairs of the apartment building that contained 92.5 grams of actual methamphetamine. (Tr. 179, 188–89.) There were identical empty plastic baggies in the crashed Escalade. (Tr. 234.) In Montano's subsequent statement, he admitted that he had a "little bit of drugs" on him when he went into the apartment building but did not admit to ditching the baggie. (Tr. 210, 219.) A review of the contents of Montano's cell phone revealed a conversation on August 17 wherein he agreed to provide five "zips" to another person, (Ex. 9, Doc. 112-1), with "zips" being a known reference to ounces of methamphetamine, (Tr. 243).

## B.    Defense Theory

At trial, Montano admitted to being a methamphetamine addict and user that casually associated with drug dealers and other users. (Tr. 382–83.) But he argued that he was not a drug dealer or conspirator, emphasizing that law enforcement could not identify any specific drug transactions he was involved in, he was never caught physically in possession of any drugs, and that dubious circumstances surrounded the methamphetamine recovered on both August 15 and August 19.

(Tr. 387–88, 393–96.)  The defense was also very critical that Clause's testimony formed the backbone of the government's conspiracy evidence.  (*See* Tr. 384–85.)  More specifically, the defense called an inmate, Daniel Pappas, to testify that Clause told him that Montano "was having an affair with [Clause's] wife and [Clause] was going to get even for it."  (Tr. 316.)  Additionally, the case agent, Billings Police Detective Michael Robinson, conceded that Clause had failed to identify a photograph of Montano during a police interview despite being able to identify numerous other known associates.  (Tr. 320–21; *see also* Tr. 263 (Clause referring to Montano as "Nick Montoya".)  The defense emphasized that Clause could not provide any details (i.e., time, place, or amount) of any specific transactions between Clause and Montano.  (*See* Tr. 281–82.)

The defense also attempted to cast doubt on the connection between Montano and the methamphetamine recovered on both August 15 and August 19. As it relates to the baggies recovered from White's vehicle on August 15, the defense emphasized that both White and Kayla Clause were high on methamphetamine when they reported the bag and gave either incomplete or dishonest statements to law enforcement regarding both their trip to Missoula and the bag's origin.[3]  (Tr. 53–63, 94, 100, 106–10, 387.)  As it relates to the baggie

---

[3] Prior to trial, Monsanto unsuccessfully moved to suppress the contents of that bag by challenging the inventory search.  (*See* Docs. 54, 55, 60, 68, 70, 134.)

6

recovered from the apartment building on August 19, the defense elicited testimony that the officers made no effort to identify the other occupants of the apartment building, (Tr. 191), and that Montano did not actually admit that the methamphetamine was his, (Tr. 219).

## II.    The Verdict, Sentencing, and Appeal

Montano was ultimately convicted on both counts of the Indictment, and the jury found the requisite drug amount to trigger a mandatory minimum 10-year sentence on both counts. (Doc. 105.)  Following trial, defense counsel (Steven Potts) withdrew at Montano's request, and new counsel was appointed (Andrew Huff), representing Montano both at sentencing and on appeal. (*See* Docs. 122–26.)  In August 2020, Montano filed a motion for new trial under Rule 33 of the Federal Rules of Criminal Procedure, citing newly discovered evidence. (Docs. 140, 141.)  More specifically, a federal inmate who had dated White—Sam Yarbro—was willing to testify that both she and Clause lied at Montano's trial. (*See* Doc. 141-1.)  That motion was denied in October 2020. (Doc. 146.)  In December 2020, Monsanto filed a second motion for new trial under Rule 33, providing additional evidence corroborating the assertion that both White and Clause lied at Montano's trial. (Docs. 158, 159.)  In April 2021, that motion was also denied. (Doc. 167.)

7

On May 6, 2021, the Court held a forfeiture and sentencing hearing. (*See* Doc. 179 (transcript).) Following Montano's testimony, the Court ordered forfeiture of $800. (*See id.* at 31–32.) With a total offense level of 30 and a criminal history category of V, Montano's advisory Guideline range was calculated to be 151 to 188 months. (*See* Doc. 179 at 35–36.) Each count of conviction also had a mandatory minimum of ten years. (*See id.* at 36.) Montano was sentenced to concurrent terms of 151 months of custody on each count, followed by concurrent five-year terms of supervision. (Doc. 172.)

Montano appealed, (Doc. 175), and in June 2022, the Ninth Circuit affirmed his conviction in an unpublished memorandum disposition, concluding that there was not a violation of the Speedy Trial Act, his motion to suppress the bag recovered from White's vehicle was properly denied, this Court did not abuse its discretion by admitting the baggie of methamphetamine found in the stairwell of the apartment building on August 19, and the motions for new trial were properly denied. (Doc. 181.)

## III.  Current Motion

On October 6, 2023, Montano filed a pro se motion to vacate under 28 U.S.C. § 2255.[4]  (Docs. 184, 185.)  Counsel was appointed (Tobias Cook), (Docs.

---

[4] "For the purpose of starting the clock on § 2255's one-year limitation period . . . a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction." *Clay*

187, 188), and an amended § 2255 motion was filed on January 2, 2025, (Doc. 208). In his amended motion, Montano argues his trial counsel, Steven Potts, was inadequate in three ways: (1) failing to investigate or interview specific witnesses; (2) failing to challenge the chain of custody or Montano's ownership of the cell phone containing the "5 zips" text; and (3) failing to challenge the chain of custody of the methamphetamine found in the bag in White's vehicle on August 15. (*See id.* at 5–16.) Montano also raises a *Napue* claim, arguing that two of the government's law enforcement witnesses gave false testimony at trial. (*See id.* at 17–20 (citing *Napue v. Illinois*, 360 U.S. 264 (1959)).) Finally, Montano argues that the cumulative error of his counsel's ineffectiveness and the government's *Napue* violations warrants relief. (*Id.* at 20–21.) In support of his amended motion, Montano filed five exhibits, including: (1) a letter by Joshua Roberts, (Doc. 208-1); (2) Declaration of Will Rogers, (Doc. 208-2); (3) Private Investigator's Memorandum, (Doc. 208-3); (4) Declaration of Rolando Perez, (Doc. 208-4); and (5) FBI 302 Report, (Doc. 208-5). Montano also submitted an audio recording of his August 19, 2018 police interview. (Doc. 209.)

---

*v. United States*, 537 U.S. 522, 525 (2003). Here, Montano's request for rehearing was denied on July 11, 2022, which meant that the 90-day period for filing a petition for writ of certiorari expired on October 9, 2022. *See* Rule 13.1–13.3, Rules of the Supreme Court of the United States. Thus, Montano had to file his habeas petition on or before October 9, 2023.

On May 27, 2025, the government responded, (Doc. 214), and attached four sealed exhibits: (1) an FBI 302 summary of Clause's debrief interview, (Doc. 215-1); (2) an FBI 302 summary regarding a letter Kayla Clause received from Rolando Perez, (Doc. 215-2); (3) an FBI 302 summary of Shane Nimock's interview, (Doc. 215-3); and (4) the application for search warrant of a "black Samsung cellular phone," (Doc. 215-4). According to the government, there were strategic reasons to not call the witnesses or challenge the evidence identified above and that even if the evidence had been presented, Montana would have been convicted.

Montano did not file a reply but Potts, his trial counsel, was *sua sponte* ordered to address the issues raised in Montano's amended motion. (Doc. 216.) Potts did so, indicating that while most of Montano's claims are baseless, "there is some merit to a portion of his allegations." (Doc. 217 at 4.) More specifically, Potts admits that he should have called Joshua Roberts to testify and presented evidence to contradict White's purportedly false testimony that Roberts and Montano dealt drugs together in the spring of 2018. (*See id.* at 6–15.) According to Potts,

> The government's evidence presented at trial and described [in his declaration] was false and harmful. I could have and should have done a better job being prepared with White's recorded interview to impeach her. I also should have objected to the government's leading questions, which suggested the false answers that White gave.

> The trial did not result in the truth. This was caused by the government's discovery dump, the prosecutor's leading the witness to

testify untruthfully, White's own untruthfulness, and my failing to stop White's testimony (by objecting more than I did) and impeach White (via better cross examination using her recorded statement).

I do not recall Montano requesting that I call Joshual Roberts as a witness. I had no expectation prior to White's testimony that she would testify that Roberts and Montano were distributing together, in or near a hotel or otherwise, so I do no[t] know what questions I would have planned to ask him. If I had objected more and impeached White better than I did, I doubt we would have needed to call him as a witness. Also, unfortunately, there would have been a significant credibility issue about his testimony given his status as a violent, drug-dealing felon. Make no mistake, however, Roberts seems to be telling the truth.

(*Id.* at 16–17.) The parties filed responses to Potts' declaration, both arguing that it supports their respective positions. (Docs. 218, 220.)

An evidentiary hearing was held on March 27, 2026. (*See* Doc. 222 (Min. Entry).) The following three witnesses testified at that hearing: Montano, Potts, and one of Clause's former lieutenants, Rolando Perez. That testimony is discussed further in the context of the substantive motion below.

## ANALYSIS

According to Montano, White and Clause both lied about his involvement in the Clause conspiracy, and Potts failed to effectively present a defense theory showing that Montano did not know, nor was he associated with, Clause or the methamphetamine recovered on either August 15 or August 19. As discussed above, Montano's claims fall into two categories: ineffective assistance of counsel and *Napue* violations. Review of those claims is complicated by the fact that

counsel's amended § 2255 motion incorporates by reference Montano's pro se motion, (*see* Doc. 208 at 2), despite this Court's admonition that such incorporation is improper, (*see* Doc. 187 at 2 (instructing that the amended § 2255 motion would "supersede Montano's *pro se* motion").)  While that impropriety would generally mean that Montano's pro se arguments would be considered waived, defense counsel complicated matters when he focused extensively on several of Montano's pro se arguments at the March 27 evidentiary hearing. Recognizing that the government has not had an opportunity to respond to those arguments, (*see* Doc. 210 (ordering the government to answer only the amended § 2255 motion)); *see Clark v. Sweeney*, 607 U.S. 7, 9 (2025), the analysis below considers both Montano's amended motion and the discrete pro se matters discussed at the evidentiary hearing.  The remainder of the 19 claims contained in Montano's 500-page pro se motion that were not discussed in the amended § 2255 motion or at the evidentiary hearing are considered waived.  For the reasons discussed below, Montano is not entitled to relief.

## I.      Ineffective Assistance of Counsel

The Sixth Amendment guarantees the right of effective assistance of counsel at all critical stages of a criminal proceeding.  *See United States v. Gonzalez*, 113 F.3d 1026, 1029 (9th Cir. 1997).  To prevail on an ineffective assistance of counsel claim, a petition must show that (1) "counsel's representation fell below an

objective standard of reasonableness," and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). That is, the petition must show not only that there was a deficiency, but that the deficiency was prejudicial. *Id.* at 692. "[I]t is unnecessary to consider the prejudice prong of *Strickland* if the petition cannot even establish incompetence under the first prong." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. To wit, the Supreme Court has cautioned that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Montano's ineffective assistance of counsel claims can be divided into the following categories: (1) failing to investigate or interview specific witnesses; (2) failing to adequately challenge the government's evidence as it relates to the cell phone and the coconspirator text messages located on it, the methamphetamine found in White's vehicle on August 15, and the existence of a passenger in the

13

crashed Escalade on August 19; and (3) failing to properly advise Montano on his right to testify and/or call himself as a witness. These claims are discussed in turn.

## A.    Failure to Investigate or Call Witnesses

Montano first argues that trial counsel was ineffective for failing to investigate or call specific witnesses at trial to undermine any link between Montano and the alleged drug distribution activities. According to Montano, numerous witnesses, including other members of Clause's inner circle, would have testified that he was not part of Clause's drug operation and did not sell drugs for him. Those witnesses are Joshua Roberts, William Rogers, Tianna Flye (née Pantalion), Rolando ("Rolo") Perez, and Sean Nimocks. Montano also identifies Juliana Braml, Deb Rindall, and unidentified prerelease officers as putative witnesses, arguing that they would have shown that the thousands of dollars in cash recovered by law enforcement had been lawfully earned.

"A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999) (internal quotation marks and alteration omitted). Nevertheless, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "A

14

disagreement with counsel's tactical decision does not provide the basis for declaring that the representation was constitutionally deficient." *Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006). "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 486 U.S. at 681.

The record on this issue is mixed. While it shows, and Potts recognizes in his declaration, that the case could have been tried differently, those differences are largely the product of hindsight, not incompetent counsel. As Potts stated at the March 27 hearing, he issued subpoenas and called three witnesses to testify during the defense case when he was asked to do so by Montano. (*See* Docs. 82–84.) Potts also had good reasons for being wary of calling both law enforcement officers and coconspirators, emphasizing that there are reasons both types of witnesses may testify adversely to the defendant. And finally, Potts, unlike Montano, recognized the major weaknesses in the defense case, including the fact that Montano accompanied Clause's wife and sister on a ten-hour road trip to Missoula and back and the fact that Montano had two law enforcement contacts involving dealer amounts of methamphetamine. Nonetheless, there are a few instances where Potts failed to investigate certain viable defense theories despite both Montano's requests to do so and a discovery record that did not contradict

15

those theories.  Potts' performance was therefore deficient in at least a few ways as it relates to his failure to investigate some witnesses.  However, as explained below, Montano fails to show that the omitted testimony may have been sufficiently compelling to "undermine confidence in the verdict," *Lord*, 184 F.3d at 1093, or that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different, *Strickland*, 466 U.S. at 688.

### 1.    Joshua Roberts and Impeachment of White

Montano's primary argument regarding witnesses and impeachment is that White and her brother Clause lied on the stand and that Potts should have more aggressively cross-examined White and called Joshua Roberts, White's ex-boyfriend and Clause's ex-drug partner, as a witness.

Prior to trial, the discovery in the case indicated that Roberts and Clause, who had met in prison, began to deal drugs together in 2018 after Clause learned that Roberts had a source of supply for methamphetamine from California.  (*See* Doc. 215-1 at 2.)  After Roberts was arrested in April 2018, Clause continued the drug trafficking operation without him and, after Roberts was released from jail, Clause alleges that Roberts stole a pound of meth from him, permanently ending their association.  (*See id.* at 3–5.)  According to White, who was dating Roberts in the spring of 2018, (Doc. 219 at 2:41), Roberts sold that pound of

16

methamphetamine from a hotel room in Billings and did not give Clause any of the proceeds, (*id.* 36:00). Roberts was then arrested again in June 2018. (*Id.* 10:44.) Thus, discovery revealed an association between Roberts and Clause and between Roberts and White.

At trial, White testified for the first time that Roberts and Montano were selling drugs together in the spring of 2018 out of a hotel in Billings, (Tr. 38–32, 39–40, 59–61), and Clause testified that after he broke ties with Roberts, Montano began dealing for him, (Tr. 266). Montano has presented an undated letter from Roberts, stating:

> Trystan White was my girlfriend back in 2018. She[']s lying about Nicholas Montano, her, and I ever being at a hotel with Meth. I never sold meth with Nicholas. I gave Nicholas a quarter gram of meth a few times so he could use it to get high with. But never at a hotel did I do that. I never saw Nicholas with Josh Clause or heard that he sold drugs for Josh Clause. Josh Clause thought Nick was my friend and so he wouldn't give Nick drugs. But I was never at a hotel where it was me, Trystan, and Nick together. Never. Not with drugs either. I wanted to testify at Nicholas Montano's trial to say Nick had nothing to do with anything and that Josh Clause is lying. I would have said this had I been called to testify.

(Doc. 208-1.)

According to Potts, he does not remember Montano asking him to interview Roberts, (Doc. 217 at 17), although Montano indicates that he did so, (*see* Doc. 185 at 58). Moreover, according to Potts, he "do[es] not recall any discovery that indicated Montano and Roberts were distributing drugs together," (Doc. 217 at 7),

and he was "shocked and surprised by White's testimony on the first day of trial that Montano and Roberts dealt drugs together," (*id.* at 8). Indeed, in her September 4, 2018 interview with Detective Robinson, White mentioned Roberts dealing Clause's stolen methamphetamine but did not refer to Montano. (*See* Doc. 219 at 35:23.) According to Potts, he was "baffled for weeks by [White's trial] testimony. I just plain did not expect it based on the discovery I reviewed." (Doc. 217 at 10.)

While the purported falsity of White's testimony is addressed below in the context of Montano's *Napue* claims, Potts' performance is evaluated here. As shown above, while Potts was aware prior to trial that Roberts knew both Montano and Clause, he had no reason to think that Roberts would provide any exculpatory, let alone relevant, testimony about Montano's drug dealing activity or his purported involvement with Clause. It was not until White testified that Potts became aware of any evidence that Montano and Roberts were allegedly dealing together, though even that fact lacked a connection to Clause. Further, Roberts was undisputedly no longer part of Clause's drug operation by June 2018, the date the indicted conduct began. Roberts was in fact in jail during the most relevant portion of the time period under indictment. Thus, prior to trial, Potts did not have a reason to interview Roberts or call him as a witness to undermine the testimony of either White or Clause.

18

As it relates to Potts' impeachment of White, he could, as he concedes, have done a better job of pointing out her inconsistent prior statement to law enforcement. But, standing alone, the prejudice that flowed from that failure is minimal, as White could have reasonably testified that she did not think it was relevant to mention Montano at the time. Thus, that inconsistency is minor. And, in closing, Potts argued that the conduct introduced by White—Roberts and Montano's selling drugs in a hotel in Billings—fell outside the timeframe alleged in the conspiracy. (*See* Tr. 388–89.) Thus, prejudice has not been shown here.

Because Montano fails to show Potts' conduct fails under either prong of *Strickland* in this context, his claim fails on these facts.

### 2.  Will Rogers

White testified at trial that Will Rogers, one of Clause's lieutenants, met with her when she and Montano were dropped off in Laurel on August 15. (Tr. 45–46; *see also* Tr. 322.) She further testified that Rogers was with Montano in a hotel room when she went to collect money to pay for her brother's retainer, (Tr. 53–54), and in the same vehicle as Montano in the Cracker Barrel parking lot on August 15, (Tr. 49). Like White's testimony regarding Roberts above, White did not mention Montano in the same breath as Rogers in her September 4, 2018 police interview. (*See* Doc. 219 at 27:44.) And Montano has presented a January 23, 2023 declaration from Rogers, stating:

> My name is Will Rogers. I never meet [sic] Nick Montano, I was never at a hotel with him, I was never at Tyson Gilmore's house with Nick Montano. I would have testified to this too. I heard that Trustan [sic] White said she saw me being around Nick, but she is lying. [H]ad Nick's attorney talked to me I would have told him this and that I would have testified at trial that Trustan [sic] is lying. I still will testify that she is lying. I say these things are true and correct under penalty of perjury. 28 USC [§] 1746.

(Doc. 208-2.)

Potts attests that Montano did not request that he interview Rogers. Montano disagrees, asserting that Rogers approached him while the two men were being held in custody in Basin, Wyoming prior to trial. Counsel's failure to independently identify a witness is not ineffective assistance insofar as "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Strickland*, 466 U.S. at 691. But even if Montano had requested that Potts interview Rogers, it was unclear what purpose he would serve because while both Montano and Rogers claim to have no connection, there was discovery indicating that Rogers and Montano knew one another. ( *See* Doc. 217 at 60 (statement by Tyson Gilmore, Clause's right-hand-man, that he "recalled Nick Montano being involved with Rogers"); *see id.* at 61 (indicating that Gilmore positively identified Montano).) And if Rogers did not know Montano, there was no reason for Potts to think that Rogers had information relevant to Montano's case

20

and therefore no basis to further investigate Rogers' involvement. *Strickland*, 466 U.S. at 690. Ultimately, the relevant inquiry under *Strickland* is whether defense counsel made an informed decision about how to approach a witness based on a reasonable investigation. Given the record at the time of trial, Potts' failure to call or investigate Rogers was reasonable. These facts do not give rise to a viable ineffective assistance claim.

### 3.  Tianna Flye (née Pantalion)

Tianna Pantalion, Montano's codefendant, appears one time in the trial record in the case; i.e., when defense counsel confirmed with the case agent that while Clause had been unable to identify a photograph of Montano, Clause positively identified a photograph of Pantalion. (*See* Tr. 322.) The docket records for the two defendants indicate that the only link between them is the allegation that they were both supplied methamphetamine by Clause. (*See* Doc. 42 at ¶ 11.) Indeed, according to Montano's private investigator, while Pantalion was distributing drugs with Clause in 2018 and "was on the same indictment as Montano, she [stated that she] had never met him and had not heard of [Montano]." (*See* Doc. 208-3.)

As an initial matter, Montano concedes that he was unable to get an affidavit or sworn declaration from Pantalion despite multiple attempts to do so. (*See* Doc. 208-3 at 2.) It is therefore unclear whether she would testify consistently with

21

what the investigator relayed above. But if she did, her testimony would have no bearing on the methamphetamine recovered on either August 15 or August 19. However, the fact that Montano had never met his codefendant fits squarely within the defense's theory that he was not involved with Clause or his drug operation. To be sure, a lack of direct contact with Pantalion does not mean Montano did not have a relationship with Clause. However, it could undermine Clause's testimony about both the frequency and drug amounts associated with his and Montano's interactions. Thus, Potts' contention that Pantalion was "irrelevant" to a defense is not compelling. (Doc. 217 at 20.)

Potts is correct, however, that blindly calling Pantalion as a witness would be difficult and posed a substantial risk. Although Pantalion was sentenced prior to Montano's trial, Potts would have needed to get permission from her lawyer to speak with her, *see United States v. Nickerson*, 556 F.3d 1014, 1018 (9th Cir. 2009) (citing Mont. R. Prof. Conduct 4.2), and he may have needed to seek use immunity if he chose to subpoena her to testify at trial and she intended to invoke her Fifth Amendment right, *see United States v. Flores-Blanco*, 623 F.3d 912, 917 (9th Cir. 2010). Notably, Pantalion only pled to and was sentenced on a distribution charge while the conspiracy charge against her was dismissed. (*See* Doc. 39); *United States v. Franz*, 469 F.2d 76, 77 (9th Cir. 1972) (per curiam) (holding that invocation of Fifth Amendment by codefendant appropriate where

22

"[t]he testimony sought would have incriminated the codefendant beyond the charge to which he had pleaded guilty"). Thus, it is unlikely that Potts would have been able to interview Pantalion prior to trial and equally unlikely that he would be able to compel her testimony. And he would have done all of that not knowing whether her testimony would help or hurt the defense theory of the case. Finally, if Potts confronted Pantalion on the stand regarding an alleged lack of connection between herself, Montano, and Clause, it would give the government an opportunity to emphasize the size and complexity of the Clause conspiracy by walking through all the possible known associates and coconspirators. Thus, while Potts likely should have attempted to interview Pantalion, these facts do not provide a basis for relief.

### 4.    Rolo Perez

At trial, Clause testified that Roland ("Rolo") Perez was one of his lieutenants. (Tr. 263, 287, 298.) Montano has presented an April 20, 2020 declaration from Perez explaining his association with both Montano and Clause, making clear that Clause did not know Montano and only sought him out at one point to locate Roberts. (*See* Doc. 208-4.) After both Clause and Perez were arrested, Perez states that:

> Clause informed me that his sister, Trystan White, had told him that
> Nick Montano had snitched on her or made law enforcement aware that
> she had meth at her house. Clause then went on to say that he was glad
> he never dealt with Montano because he's a rat and Montano would

23

> snitch on him.  He then asked me if I ever delt [sic] with Montano and was worried about how much Montano might know about Clause's methamphetamine operation.  I informed Clause that I never delt [sic] with Montano, or talked about any of my business with him, and the conversation ended there.

(*Id.* at 3–4.)  Montano argues that he told Potts to interview Perez and that Potts should have called him as a witness.  In response, Potts argues that he was not told to investigate Perez, much of Perez's putative testimony is inadmissible, much of the testimony is irrelevant, and Perez would have credibility problems due to his criminal history and involvement in the Clause conspiracy.  These responses do not show a "strategic choice[] made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690.

To be sure, consistent with Potts' response, much of the information provided by Perez is hearsay and may therefore not be admissible as a defendant does not have an "unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988); *see also Cannedy v. Adams*, 706 F.3d 1148, 1163 (9th Cir. 2013) ("[A] failure to introduce evidence that is clearly inadmissible cannot be prejudicial[] because there is no chance that the jury ever would have heard that evidence.").  However, that does not provide a particularly compelling reason to fail to pursue Perez here, as one of the fact witnesses Potts did call at trial, Daniel Pappas, testified entirely to hearsay statements made by Clause.  (*See* Tr. 315–16.)  As to its relevance, Perez's

24

testimony would have furthered the defense theory that Clause lied about knowing Montano and his role as a lieutenant because Perez was undisputably part of Clause's organization. (*See* Tr. 263; Doc. 215-1 at 17.)

In regard to credibility, Potts' skepticism of criminal history does not excuse Potts' failure to call him in the absence of actually speaking to him. *See Riley v. Payne*, 352 F.3d 1313, 1324 (9th Cir. 2003). While Perez was under indictment and had not yet been sentenced by the time of Montano's trial, there is no indication that Potts attempted to reach out to Perez's attorney, *see Nickerson*, 556 F.3d 1014, 1018, or attempted to subpoena him to testify at trial. "Although trial counsel is typically afforded leeway in making tactical decisions regarding trial strategy, counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision." *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006). "The duty to investigate is especially pressing where, as here, the witnesses and their credibility are crucial to the [government]'s case." *Id.* Here, Clause's testimony was the government's strongest evidence of a conspiracy and Perez's testimony would contradict Clause's testimony that he knew and worked with Montano. And, because Clause was also a drug dealer and member of the conspiracy, there is no reason to think that the jury would believe one or the other just because of their criminal conduct. Accordingly, it was objectively unreasonable for Potts to fail to investigate Perez.

25

That all said, there are a few good reasons a competent attorney would not have called Perez to testify even if that attorney had Perez's declaration prior to trial. First, Perez's current declaration aside, there is nothing in the record that indicates he would testify favorably for Montano and, as mentioned above, it was unlikely that Perez's counsel would agree to an interview. Thus, the decision to call Perez would rest heavily on Montano's own assertion of their relationship and, as made clear at the March 27 hearing, discussions between the two men while in the local jail. That would present a major blind spot for Potts to walk into at trial. Second, there was evidence that Montano and Clause did in fact know each other. For example, Kayla Clause testified that Montano accompanied them on their trip to Missoula because he "was a friend of [Clause]'s" and "[Clause] had him come up with me and [White] to Missoula to get an attorney." (Tr. 81.) And in his August 22, 2018 interview with law enforcement, Montano himself admitted that he "met [Clause] a couple times." (Doc. 68-1 at 12.) This evidence is inconsistent with both Montano and Perez's assertion that the two men had only interacted one time and were not otherwise aware of one another. Finally, and of greatest concern, discovery included a law enforcement summary of a letter Perez sent to Kayla Clause in April 2019 wherein Perez offered to lie about owning a firearm if it would help Clause. (*See* Doc. 215-2 at 1.) Not only does such evidence undermine Perez's penchant for honesty, but it indicates that if forced into a

26

loyalty test in front of the jury, Perez may have chosen Clause over Montano.

The above amounts to somewhat of a nullity for both competence and prejudice. A competent attorney should have done more to investigate Perez. But equally so, competent counsel may have decided not to call Perez or done so and, consistent with the record at the time of trial, Perez may have testified against Montano's interests. Additionally, none of Perez's putative testimony undermined the methamphetamine recovered on either August 15 or August 19. Accordingly, Potts' errors as to Perez do not meet the *Strickland* standard.

### 5.    Shaun Nimocks

According to Montano, Nimocks had extensive knowledge of Clause's drug trafficking operation and would have testified that Clause "severely lied" about the amount of drugs he gave Nimocks to distribute. (Doc. 159-3.) In an undated letter, Nimocks states that Clause told law enforcement that he gave Nimocks 15 to 20 pounds of methamphetamine while in fact he only gave Nimocks 1.5 pounds of methamphetamine. (*Id.*) Nimocks is one of Perez's codefendants, (*see United States v. Perez*, 1:19-cr-35-SPW-3), and he was ultimately held responsible for receiving 2.25 pounds of methamphetamine from Clause, (*see id.*, Doc. 195 at ¶ 16). The record indeed reflects that Clause reported providing Nimocks with more methamphetamine than Nimocks admits to having received. (*See id.*, Doc. 195 at ¶¶ 15–16; *id.*, Doc. 90 at 2); (*compare* Doc. 215-3 *with* Doc. 215-1.) At

best, Nimocks' testimony could have been used to show that another drug defendant believed that Clause had overstated the amount of drugs he had given them. But the defense's theory of the case here was not that Clause merely overstated the amount of drugs he gave Montano, but that Clause lied about Montano's involvement entirely. (*See* Tr. 392.) And trial counsel did in fact attempt to advance that theory by vigorously cross-examining Clause about the veracity of any of his timelines, (*see* Tr. 279–89), and emphasizing Clause's poor responses in his closing, (Tr. 389–91). Additionally, Nimocks had not yet been sentenced at the time of Montano's trial and his putative testimony would only undermine Clause's credibility as to the drug amount but not "directly contradict[]" it, posing a problem for use immunity under the Fifth Amendment. *See Flores-Blanco*, 623 F.3d at 917.

Ultimately, Potts does not address in his affidavit whether he was aware of Nimocks' putative testimony or if he made a conscious decision not to call him as a witness. Nonetheless, considering the limited relevance of Nimocks' putative testimony, Montano fails to show that the result of the proceedings would have been different had Nimocks testified. *Strickland*, 466 U.S. at 687–88.

**6.    Juliana Braml, Debora Rindahl,[5] and Prerelease Officers**

---

[5] Defense counsel identifies Montano's mother as "Ms. Rindall." (*See* Doc. 208 at 9–10.) In the presentence report she is identified as Debora Rindahl. (*See* PSR ¶ 48.) That second spelling is used here.

Finally, Montano argues that the trial counsel should have called witnesses to verify the source of the cash that was found in connection with him on August 15 and August 19. More specifically, Montano argues that counsel should have called Juliana Braml, his supervisor at the Rib and Chop House, Deborah Rindahl, Montano's mother, and a prelease officer to testify to the fact that he made approximately $9,000 in 2016 and was unable to spend that money between 2016 and 2018 because he was on prerelease. This argument lacks merit because Potts had valid concerns about introducing testimony related to the money. First, none of these three witnesses had any personal knowledge about the cash Montano was carrying in August 2018, whether it was his legal compensation from prior employment or otherwise. Second, Potts was concerned about what Montano had already told law enforcement about the money. Specifically, during his August 19, 2018 interview, Montano told Billings Police Officer Hilde that he got the money "from wom[e]n, girls give me money," and then that "[he] stole it from some people too." (Doc. 60-5 at 8.) And during his August 22, 2018 interview, Montano told Detective Robinson that he got the money from gambling and that girls just gave it to him. (Doc. 68-1 at 3–4.) Montano's story of the money's origin also changed over time. At his forfeiture hearing, for example, Montano admitted that he attempted to get his stuff back from White and ended up taking approximately $800 from her vehicle. (Doc. 179 at 14; *see also* Doc. 185 at 32.)

Had that information come out at trial, it would have had the dual effect of enhancing White's credibility while diminishing Montano's credibility. Accordingly, Potts' decision not to pursue these witnesses or this line of inquiry was reasonable and did not prejudice the defense.

## B.    Failure to Challenge Evidence

Montano further argues that Potts was ineffective for failing to adequately challenge the government's cell phone evidence, the methamphetamine recovered from White's vehicle, and the passenger from the Escalade.  These points are addressed in turn.

### 1.    Cell Phone

At trial, the government presented evidence of a cell phone that contained drug-related messages that were sent between August 15 and August 19, 2018. (Tr. 236, 244)  While trial counsel objected to the admission of communications from this cell phone based on completeness, hearsay, and foundation, (Tr. 239–41), Montano argues that trial counsel was ineffective for failing to "challenge the chain of custody or the identity of the owner of the cell phone," (Doc. 208 at 12), and for allowing coconspirator texts to be admitted.  Neither argument has merit.

#### a.    Ownership/Chain of Custody

According to Montano, the government never proved at trial that the cell phone actually belonged to him or that there was a proper chain of custody.  In

response, the government concedes that where the phone was found was not addressed at trial, (*see* Tr. 209), but argues that the record conclusively shows that it belonged to Montano and therefore it was reasonable for trial counsel not to pursue this issue. Indeed, the application for the search warrant for the phone states that it was found near the pants Montano discarded during his flight from the police on August 19, 2018. (Doc. 215-4 at 5.) Additionally, the phone was active for the short period after Montano lost his original phone, (Tr. 93), it contained texts directed to "Nick," (Tr. 244), and Montano essentially conceded the phone was his during his August 22, 2018 interview, (Doc. 68-1 at 14). Indeed, during that interview, Montano admitted to losing his phone, getting a new one, and having a text exchange with someone named "Sebastian" regarding "five zips." (*Id.* at 13–14.) Thus, there was record evidence connecting Montano to the phone and it was reasonable for Potts to not want the government to elaborate on that evidence in front of the jury. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.") Nevertheless, trial counsel *did* try to challenge the connection between Montano and the inculpatory messages, obtaining a concession from Detective Robinson that he could not say for sure that Montano was the one operating the phone when the texts were sent, (Tr. 254), and pressing law enforcement on the

31

accuracy of the data extraction by highlighting an inexplicable message from 2015, (Tr. 238). Trial counsel's performance in this area was not deficient.

Montano's arguments about the cell phone's chain of custody fare no better. The Ninth Circuit has explained, "[t]he possibility of a break in the chain of custody goes only to the weight of the evidence. In addition, the prosecution [i]s not required to call the custodian of the evidence." *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991) (internal citation omitted); *see also Melenez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009). While highlighting minor blunders associated with bagging and tagging the phone could cast some doubt on the competence with which the evidence was handled, (*see* Doc. 185 at 56–57), it does not make the evidence inadmissible but instead would draw attention to the efforts law enforcement had put into their investigation of Montano. As stated by Potts, "[o]bjecting to the chain of custody would have caused the government to call law enforcement witnesses who likely would have calmly testified about their careful efforts with respect to the phone, that they discussed the ['5 zips'] message with Montano, who did not deny that he had received it or that the phone was his, and there would just be more evidence about how careful law enforcement had been." (Doc. 217 at 26.)

### b.    Coconspirator Text Messages

In his pro se motion, Montano argues that Potts was ineffective for failing

to get certain cell phone text messages excluded on hearsay grounds, specifically the message requesting "5 zips." (*See* Doc. 112-1 at 18; Doc. 185 at 307–25.) However, Potts specifically made a hearsay objection and it was overruled on the basis that the texts were statements by a coconspirator, Sebastian Guetter, who had not been discussed in Montano's trial. (*See* Tr. 239–40.)  While Montano argues that Potts should have challenged this issue further, Potts' express objection was overruled and, as made clear by the trial transcript, Potts was reluctant to have the prosecution expound on coconspirator conduct in front of the jury.  (*See* Tr. 241 (Potts responding, "I don't want it," in response to the prosecution stating that it could lay the foundation).)  That wariness was well-founded as the record indicates that the government could have made the requisite connection through one of Clause's lieutenants, Joe Michael.  (*See United States v. Michael*, 1:18-cr-101-SPW, Doc. 79).   To be sure, the Ninth Circuit "ha[s] consistently recognized that evidence that a defendant merely associated with a member of a conspiracy has little probative value in demonstrating the defendant's connection to that conspiracy." *United States v. Silverman*, 861 F.2d 571, 579 (9th Cir. 1988).  But if the government made its record regarding Guetter's relationship with both Clause and Montano in front of the jury, it would have reinforced Montano's involvement in the conspiracy because Montano admitted during his August 22, 2018 interview to knowing Guetter and texting him about drugs. (*See* Doc. 68-1 at 13–14.)

33

Montano has therefore failed to show that Potts' representation on this issue fell below a minimum standard of reasonableness.

### 2.    Bag in White's Vehicle

Prior to trial, Potts unsuccessfully sought to suppress the methamphetamine found in a bag in White's car, challenging the inventory search performed by law enforcement. (*See* Docs. 54–55, 60, 68, 70.) Montano argues that trial counsel was ineffective for failing "to challenge the chain of custody" of those drugs. (Doc. 208 at 12.) More specifically, Montano argues that while there were two baggies of methamphetamine (one weighing 22.3 grams and the other weighing 14.5 grams) within that bag, (Doc. 208-5), the photograph presented by the government at trial showed only a single baggie of methamphetamine, (Doc. 112-1 at 2), and Billings Police Officer Raschkow indicated that that photograph "accurately show[ed] what was in the bag[,]" (Tr. 129), which included a "sandwich bag that contains a little over an ounce of what was later tested positive as methamphetamine," (Tr. 130). However, Detective Robinson subsequently testified that two baggies of methamphetamine were recovered from the bag, the second baggie was not depicted in the photograph, and the contents of both baggies were sent to the drug lab. (Tr. 225.) While Potts could have highlighted the difference between the contents depicted in Exhibit 3, (Doc. 112-1 at 2), and the search warrant return for the bag, (Doc. 54-1 at 1), the fact the photo depicted only

34

one of two baggies of methamphetamine falls short of showing that the evidence had been "changed in important respects." *See United States v. Solorio*, 669 F.3d 943, 954 n.13 (9th Cir. 2012) ("[T]he district court may admit the evidence if there is a reasonable probability the article has not been changed in important respects." (internal quotation marks omitted)). Thus, Potts was not ineffective for failing to challenge the methamphetamine found in the bag in White's vehicle in a pretrial suppression motion on these grounds.

Montano further argues, however, that Potts should have done a better job impeaching the government witnesses when they testified inconsistently about the contents of that bag. Indeed, there are numerous inconsistencies between the contents depicted in Exhibit 3, (Doc. 112-1 at 2), and the search warrant return for the bag, (Doc. 54-1 at 1). In addition to the two baggies/one baggie issue discussed above, Exhibit 3 does not depict an additional firearm magazine or a syringe and inexplicably includes a lanyard, cigarettes, a lighter, and additional wallet cards not listed in the search warrant return. These inconsistencies were ripe for cross-examination. For example, while Exhibit 3 does not show a syringe, (*see* Doc. 112-1 at 2), and Officer Raschkow testified as such, (Tr. 136), "[a] used syringe" was listed on the search warrant return for the bag, (*see* Doc. 54-1 at 1). (*See also* Tr. 125 (Officer Gaertner testifying that he did not "believe there was a syringe in there").)

Nevertheless, the record shows Potts' actions here were not objectively unreasonable. First, use and distribution are not mutually exclusive. While the presence of a used syringe may support the defense's narrative that Montano was a drug user[6] and/or that the baggies belonged to Kayla Clause and White, it does not mean Montano was not also dealing methamphetamine. Second, at least one of the items omitted from Exhibit 3, the additional firearm magazine, would have been incriminating. Drawing attention to this omission would have therefore opened the door to a detailed discussion of all the items that were in that bag and the negative picture they painted for Montano. Ultimately, because the actual contents of the bag are not exculpatory, Detective Robinson testified to some of the inconsistencies, (Tr. 225), and Montano took the position that the bag was not his, (*see* Tr. 387, 393), Montano fails to show a reasonable probability that, but for counsel's failure to highlight these irregularities, "the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. To the extent Montano argues that law enforcement testified falsely about this evidence, that claim is discussed below in the context of Montano's *Napue* claims.

### 3.    The Escalade Passenger

In his pro se motion, Montano argues that Potts was ineffective for failing to

---

[6] During the March 27 hearing, Montano disavowed ownership of the syringe and stated that he did not use methamphetamine intravenously. A claim contradicted by Montano in his August 22, 2018 interview. (Doc. 68-1 at 17.)

present evidence showing that there was a passenger in the Escalade with Montano. In his report on the August 19 car chase, Officer Bigelow noted that he "observed that the vehicle had at least one passenger in the front seat, and the driver," and when he approached the vehicle after it was crashed, both "[t]he front driver and passenger doors were open." (Doc. 60-5 at 9.) Similarly, Officer Gillen noted that he "distinctly observed a male driving the vehicle with a female in the passenger seat," (Doc. 125 at 40), and Officer Flammang noted that "[t]here was another occupant, but I could not see whom, or what gender," (Doc. 60-4 at 6). At trial, testimony regarding a passenger was limited to Officer Cook testifying on direct examination by the government that "the occupants fled on foot," (Tr. 175), and Potts asking Sergeant Becker during the defense case-in-chief whether he "indicated that there were two people in Mr. Montano's vehicle[,]" and Sergeant Becker responding that he would need to review his report and "I don't remember saying that he was by himself necessarily," (Tr. 313).

For the first time at the March 27 hearing, Montano identified the passenger in the Escalade as a woman named Courtney that he did not know but who had been hanging out at a mutual acquaintance's house with him. While it is unclear whether he passed this information on to Potts or asked him to investigate further, it is undisputed that neither law enforcement nor Potts followed up regarding the putative passenger. Although the existence of a passenger is not entirely

37

exculpatory, it could undermine the government's attempt to connect Montano, and Montano alone, to the clear plastic baggies found in the Escalade that allegedly matched the baggie containing the 92.5 grams of methamphetamine found in the apartment building stairwell. And testimony that law enforcement seemed to entirely ignore the fleeing passenger would also inure to Montano's benefit. Potts' failure to follow up on this issue with the appropriate witnesses and investigate it further therefore likely falls below an objective level of reasonableness.

Nevertheless, Montano fails to show prejudice. The existence of a passenger in the Escalade does not diminish Montano's connection to the 92.5 grams of methamphetamine that were found in the apartment stairwell, not the Escalade. The record contains no information that the passenger entered the apartment building that was secured by law enforcement when they arrested Montano. Montano fails to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different, *Strickland*, 466 U.S. at 688.

### C.   Failure to Call Montano to Testify on his own Behalf

Montano's final ineffective assistance of counsel argument is that Potts failed to adequately advise him about his right to testify or to call him as a witness in his own defense. In his pro se motion, Montano concedes that he did not affirmatively assert his intent to testify but rather, when asked at trial, stated he

38

was "ambivalent about it." (Tr. 306.) Courts have consistently held that when a defendant remains silent at trial on the issue of testifying, he cannot later claim ineffective assistance of counsel on this front. *United States v. Edwards*, 897 F.2d 445, 446–47 (9th Cir. 1990) ("[T]o hold that a defendant may abide by his lawyer's advice and not take the stand and then invalidate the trial because he so acted is not fair to the government."); *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993) ("When a defendant is silent in the face of his attorney's decision not call him as a witness, he has waived his right to testify."); *see also United States v. Gerrans*, 752 F.3d 1120, 1162 (N.D. Cal. Oct. 1, 2024) (collecting cases). There is no reason Montano's case is different. As is apparent from the record, Montano not only understands the nuances of his case but has strong opinions about how matters proceed. While he may now regret his decision not to testify, he made that deliberate choice at the time of trial.

## II.   *Napue* **Claims**

Montano further argues that the government violated his due process rights by eliciting false testimony at trial. A prosecutor's knowing use of false evidence to obtain a conviction violates due process. *See Napue v. Illinois*, 360 U.S. 264 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935); *Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006). A *Napue* claim "will succeed when (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that

39

the testimony was actually false, and (3) the false testimony was material." *Jackson v. Brown*, 513 F.3d 1057, 1071–72 (9th Cir. 2008) (internal quotation marks omitted). "Further, a prosecutor must correct false evidence whenever it appears." *Morris*, 447 F.3d at 743. "[T]he basic question is whether the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Jackson*, 513 F.3d at 1072 (cleaned up).

Here, Montano argues that the "[Officer] Raschkow falsely testified that there was only one baggie [of methamphetamine] found in the bag recovered from the vehicle Ms. White was driving, when there was actually two baggies," and "[Officer] Hilde mislead [sic] the jury to believe that Mr. Montano confessed to having methamphetamine on him when he entered the apartment complex." (Doc. 208 at 18.) Although blended with Montano's ineffective assistance claim discussed above, Potts' declaration also eludes to the idea that the government elicited false testimony from White. In response, the government argues that these claims are procedurally defaulted. Because the government is correct, Montano's *Napue* claims fail on procedural grounds. But even if assessed on the merits, Montano's *Napue* claims fail.

## A.     Procedural Default

A petitioner who challenges his conviction under § 2255 without first raising his claim on direct appeal procedurally defaults the claim. *United States v.*

40

*Ratigan*, 351 F.3d 957, 962 (9th Cir. 2003). A petitioner can overcome procedural default and raise the claim in a habeas petition "only if the defendant can first demonstrate either cause and actual prejudice or that he is actually innocent." *United States v. Braswell*, 501 F.3d 1147, 1149 (9th Cir. 2007) (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)). "Constitutionally ineffective assistance of counsel constitutes cause sufficient to excuse a procedural default." *Ratigan*, 351 F.3d at 964–65. Thus, Montano must show that appellate counsel was ineffective in failing to raise these *Napue* claims on direct appeal. *Leeds v. Russell*, 75 F.4th 1009, 1022 (9th Cir. 2023) (explaining that the *Strickland* standard applies). This is a close question. While appellate counsel likely could have pursued any and all *Napue* violations given the favorable standard that applies to such claims, "counsel's failure to recognize every possible legal argument . . . does not . . . constitute cause." *Id.* at 965. And Montano presents no evidence that he repeatedly urged or requested that these claims be pursued on appeal. *Compare with United States v. Casildo*, No. 23-35483, at 10 (9th Cir. Mar. 31, 2026). The record is also devoid of any evidence as to why appellate counsel did not pursue these *Napue* claims on appeal. Montano has therefore failed to show that he should be excused from his procedural default. His *Napue* claims are therefore dismissed. But even if considered on the merits, they do not entitle him to relief for the reasons discussed below.

**B.   Officer Raschkow**

As discussed above, Officer Raschkow incorrectly testified that a photograph of the contents of the bag recovered from White's vehicle displayed all the items recovered from the bag, even though one of the two baggies of methamphetamine was not depicted.  (Tr. 129–30.)  It is undisputed that two baggies of methamphetamine were recovered from the bag in White's car.  While this makes Officer Raschkow's testimony undisputedly false,[7] "[d]iscrepancies in the testimony about the details . . . could as easily flow from errors in recollection as from lies."  *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) *overruled on other grounds by Valerio v. Crawford*, 306 F.3d 742, 764 (9th Cir. 2002) (en banc); *see also United States v. Holmes*, 129 F.4th 636, 663 (9th Cir. 2025) ("[M]ere inconsistencies or honestly mistaken witness recollections generally do not satisfy the falsehood requirement.").  The context here does not show that the testimony was "actually false" as contemplated by *Napue*.

But even assuming Officer Raschkow's statements were false, a *Napue* violation must also be material.  "[A] *Napue* violation requires that the conviction be set aside whenever there is any reasonable likelihood that the false testimony

---

[7] In his pro se filing, Montano takes particular issue with Officer Raschkow's use of the term "sandwich bag" to describe the methamphetamine pictured in Exhibit 3.  (*See* Doc. 185 at 258–61; Tr. 130.)  Exhibit 3 does in fact depict a sandwich-sized Ziplock bag containing a white powdery substance.  (*See* Doc. 112-1 at 2.)

*could* have affected the judgment of the jury." *Jackson*, 513 F.3d at 1076 (internal quotation marks omitted). Nonetheless, "[i]t is important to situate the allegedly false testimony in the full context of the trial[.]" *Catlin v. Broomfield*, 124 F.4th 702, 742 (9th Cir. 2024). Here, there is not a reasonable likelihood that whether the methamphetamine discovered in the bag in White's vehicle was 32 grams in one baggie or 32 grams divided into two baggies could have affected the judgment of the jury. As an initial point, Detective Robinson subsequently and correctly testified that two baggies of methamphetamine were recovered from the bag in White's vehicle. (Tr. 225.) Thus, Officer Raschkow's testimony did not stand unchallenged. But more importantly, the false testimony does nothing to undermine the evidence of the 92.5 grams of methamphetamine recovered from the apartment building on August 19. *See United States v. Solorio*, 669 F.3d 943, 955 (9th Cir. 2012) (holding that because "[t]he methamphetamine produced at trial was well over" the mandatory minimum amount required to convict the defendant, "the weight difference from the drugs seized was not material"). Because neither the conspiracy nor the possession charge required the jury to find Montano responsible for the methamphetamine recovered from the bag in White's vehicle on August 15, the materiality requirement is not met.

### C.   Officer Hilde

Montano further argues that Officer Hilde falsely testified that Montano

admitted to having methamphetamine on his person when he entered the apartment complex while fleeing from law enforcement on August 19. Most of this claim fails at the first element of *Napue* because "[t]estimony that is simply inconsistent or equivocal may not rise to the requisite level of actual falsity." *Catlin*, 124 F.4th at 741. According to Officer Hilde's case report, immediately after Montano's arrest on August 19, 2018, Officer Hilde

> asked Montano to talk me through wrecking the vehicle again but he had issues remembering. I asked Montano if he remembered wrecking and he said yes. I then changed the subjects [sic] to the large amount of cash on his person and his drug abuse. I asked Montano what drug he used predominantly and he said Adderall and methamphetamine. I asked Montano when the last time he used meth was and he said today. I asked Montano if it would be foolish for me to think he dropped his meth in the building while he was knocking on doors and he stated[,] "I had a little bit of drugs on me." I asked Montano where he got the meth he used earlier and he admitted he had it and it might be about a "Gram or two."

(Doc. 60-5 at 8; *see also* Doc. 60-4 at 7 (Officer Flammang's case report).) At trial, Officer Hilde was asked about this interaction and testified that Montano told Officer Hilde that he "had drugs on him, but only about a gram or two potentially on his person." (Tr. 208–09.) The prosecutor followed up by clarifying that Montano's response was that "he had a little bit of methamphetamine on him," which Officer Hilde confirmed. (Tr. 209; *see also* Tr. 221.)

Montano argues that this testimony is misleading because in the recording of his August 19 interview with Officer Hilde, "Montano was unsure whether he had

methamphetamine on him at the time he was inside the apartment complex," (Doc. 208 at 14,) and while he admitted to using a gram or two earlier in the day "he had used it and was not sure if he had any left at the time he entered the building," (Doc. 185 at 7).  However, on that recording, Montano admitted that his drugs of choice were Adderall and methamphetamine, (*see* Doc. 209 at 9:54), he used methamphetamine that day, (*id.* 10:04), he "had a little bit of drugs on [him]" in the apartment building, (*id.* 10:24), and that he had used "a gram or two" that day, (*id.* 11:29).  To be sure, amid these admissions and in response to being asked what kind of drugs he was carrying, Montano said, "I don't know if I had drugs on me or not, man." (*Id.* 10:53.)  But this equivocation does not make Officer Hilde's recitation of his other admissions false.  Moreover, during cross-examination, Officer Hilde conceded that Montano never actually admitted that he dropped the methamphetamine that was found in the stairwell.  (*See* Tr. 219.)

But one portion of Officer Hilde's testimony was false: Officer Hilde testified that Montano "told me that he had drugs on him, but only about a gram or two potentially on his person." (Tr. 208, 222.)  As explained above, Montano admitted to having *used* a gram or two that day but he never said that was the amount he was holding at the time he was in the apartment building.  Thus, Officer Hilde improperly blended Montano's statements, making it appear as though Montano had admitted to having a specific quantity on him when he entered the

45

apartment building. As argued by the government, because this misstatement was arguably "rebuttable or subject to clarification," (Doc. 214 at 31 (citing *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 831 (9th Cir. 2024))), it is a close call under a "falsity" analysis. But even if it is considered false for the purposes of *Napue*, it is not material because admitting to carrying a "little bit" or "a gram or two" are both a far cry from the 92.5 grams recovered.[8]

### D. White

Finally, in Potts' declaration, he states a few times that the prosecutor and Detective Robinson, who had previously interviewed White, knew that White was lying about Montano's dealings with Roberts.[9] The basis for that claim is that Detective Robinson's recording of his September 4, 2018 interview with White

---

[8] In his pro se motion, Montano argues that Potts was ineffective for failing to seek to suppress his August 19, 2018 statement to Officer Hilde because his intoxication made it "involuntary." (*See* Doc. 185 at 429–40; *see* Doc. 209 (recording).) "A statement may not be admitted if because of . . . drugs[] or intoxication[] the statement was not the product of a rational intellect and a free will." *United States v. Kelley*, 953 F.2d 562, 565 (9th Cir. 1992). Here, while the recording shows that Montano was high, tired, and did not answer every question, the answers he did give were coherent and responsive and he was able to recall events accurately. "The facts indicate that the effects of [drugs or intoxication] did not overcome [Montano's] ability to think rationally." *Id.* Moreover, Montano admitted in a different statement, taken August 22, 2018, that he had "knock[ed] on all the doors" in the building, (Doc. 68-1 at 4), undermining his prejudice argument, (Doc. 185 at 437).

[9] The Ninth Circuit has not yet determined whether the knowledge of a law enforcement officer is imputed to the prosecution in the context of a *Napue* claim. *See Reis-Campo v. Biter*, 832 F.3d 968, 977 (9th Cir. 2016) (recognizing a circuit split); *see also Catlin*, 124 F.4th at 742 n.14.

shows that White only "recently" became aware of Montano's involvement in Clause's drug operation and she did not mention Montano when she described Roberts' sale of Clause's methamphetamine from a hotel room. Potts also accuses the prosecutor of using leading questions to elicit this false testimony. This argument is unpersuasive under a *Napue* standard. In its response to Potts' sworn statement, the government concedes that "White's testimony that Montano and Roberts dealt drugs together at a hotel appeared to be new information from White." (Doc. 218 at 5.) However, there were reasonable explanations for the inconsistencies in White's statements. For example, just because she did not mention Montano when discussing the sale of methamphetamine from a hotel room does not mean he was not there. And her knowledge of Montano selling methamphetamine with Roberts is distinct from her knowledge of his selling methamphetamine for Clause. Thus, this information on its own is insufficient to show that the government knowingly elicited "false" testimony.

In his pro se motion, Montano further argues that White lied about the work she had done for law enforcement prior to September 2018. However, the trial record makes clear that White was only a confidential informant for the ATF for a short period in the fall of 2018, after the August 15, 2018 incident. (*See* Tr. 77.) Other than speculation, Montano has presented no evidence to the contrary.

## III.   Cumulative Error

Montano argues that even if one of the issues addressed above is not sufficient to warrant habeas relief, the cumulative error rises to that level. "[T]he combined effect of multiple trial errors violates due process where it renders the resulting criminal trial fundamentally unfair, and the elements of *Strickland* can be satisfied through an accumulation of multiple instances of deficient performance." *Lopez v. Allen*, 47 F.4th 1040, 1053 (9th Cir. 2022) (internal quotation marks and citations omitted); *see also United States v. Nobari*, 574 F.3d 1065, 1082 (9th Cir. 2009) ("The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." (internal quotation marks omitted)). This argument is unpersuasive given the limited errors discussed above.

## IV.    Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484

(2000)).  A certificate of appealability is granted.

## CONCLUSION

Based on the foregoing, IT IS ORDERED:

1.  Montano's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 (Docs. 184, 208) is DENIED.

2.  A certificate of appealability is GRANTED.  The clerk shall immediately process the appeal if Montano files a Notice of Appeal.

3.  Montano's motion to compel (Doc. 224) is DENIED as MOOT.

3.  The clerk shall ensure that all pending motions in this case and in CV 23–115–BLG–SPW are terminated and shall close the civil file by entering judgment in favor of the United States and against Montano.

DATED this _13th_ day of April, 2026.

Susan P. Watters, District Judge
United States District Court